## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

TANER ORAN,      :
          :   CIVIL ACTION
    Plaintiff,   :
          :
    v.      :   No. 08-0034
          :
FAIR WIND SAILING, INC., et. al. :
          :
    Defendants.  :

### MEMORANDUM

BUCKWALTER, S.J.          November 23, 2009

 Currently pending before the Court is the Motion for Summary Judgment of Defendants Fair Wind Sailing, Inc. and BFM Sailing I, LLC., the Response in Opposition of Defendants' Motion by Plaintiff Taner Oran, and the Defendants' Reply Memorandum.  For the reasons stated below, the Defendants' Motion is granted.

## I. FACTUAL BACKGROUND

 Plaintiff Taner Oran's claim for relief arises from injury he suffered when he slipped and fell on bench cushions aboard a forty-five foot catamaran owned by Defendants BFM Sailing I, LLC and operated by Fair Wind Sailing, Inc. (collectively, "Moving Defendants").  (Sec. Am. Compl. ¶¶ 5, 9, 11; Bello Decl. ¶ 7; Moving Defendants' Yacht Management Agreement, Ex. A at 1. )  Fair Wind Sailing, Inc., ("Fair Wind")  a Michigan corporation, runs the Fair Wind Sailing School.  The Sailing School offers an "Instant Bareboater and Catamaran" course based in the territorial waters of the United States and British Virgin Islands.  (Bello Decl. ¶¶ 2-3.)

BFM Sailing I, LLC, ("BFM") a Michigan limited liability corporation, provided Fair Wind Sailing, Inc. with a Robertson and Caine-manufactured, forty-five foot Leopard Catamaran (which bore the name, *Hound Dog*) for the Fair Wind Sailing School's use.  (Bello Decl. ¶ 4; Bello Decl. Ex. A., "Yacht Management Agreement"; Bello Decl. Ex. 3, BFM Sailing I, LCC Articles of Organization.)  Pursuant to a "Yacht Management Agreement," BFM would furnish Fair Wind with use of the *Hound Dog* in exchange for Fair Wind's payment of a $150 fee for each day Fair Wind used the Catamaran for its sailing school and a 50% share of any revenue gained from Fair Wind's use of the *Hound Dog* for charter cruises.  (Bello Decl. ¶ 4; Bello Decl. Ex. A., "Yacht Management Agreement.")  The Agreement further provided that BFM would maintain the yacht in operating condition as well as cover major repairs at all times and minor repairs in relation to the vessel's use for chartering.  (Bello Decl. Ex. A., "Yacht Management Agreement.")

The Fairwind "Instant Bareboater and Catamaran" course features "week-long, live-aboard sailing lessons designed to prepare students to learn to sail or bareboat charter cruising catamarans."  (Bello Decl. ¶¶ 2-3.)  The course offeres American Sailing Association certification in basic sailing and cruising, bareboat charter sailing, and catamaran sailing.   The course aims to instruct students on essential boat systems required to live aboard a sailboat – e.g., engine maintenance, cooking and provisioning, basic marine electrical and plumbing systems – and prepares students to skipper boats as large as fifty feet.  (Bello Decl. ¶¶ 2-3.)

During January 2007, Plaintiff called Fair Wind to inquire about the "Instant Bareboater and Catamaran" sailing class, and spoke to the President of Fair Wind, David Bello..  (Bello Decl. ¶¶ 5-6.)  Plaintiff expressed his interest in signing up for the May 5 through 11, 2007 class.

Mr. Bello claims that he then sent Fair Wind Sailing School's Course Agreement with Terms and Conditions ("Course Agreement") and Liability Waiver and Release ("Release") forms to Plaintiff. (Bello Decl. ¶ 6.) Later that month, Fair Wind received Plaintiff's signed and completed Course Agreement – dated January 15, 2007 – and Plaintiff's check for half of the tuition as a deposit on the course. (Bello Decl. ¶ 8, Ex. B ) Fair Wind and Plaintiff agree that Plaintiff did not return the executed Release at that time. (Bello Decl. ¶ 8; Oran Aff. ¶¶ 3, 6.) At this point, however, Plaintiff and Moving Defendants' factual allegations diverge.

Moving Defendants contend that "no one is permitted to participate in any of Fair Wind Sailing School's classes or activities, or even to board any of its vessels, without executing both of these agreements." (Bello Decl. ¶ 7.) The Release itself specifies that it "must be read and signed before the participant is permitted to take part in the Fair Wind Sailing School Program." (Bello Decl. Ex. C.) According to Mr. Bello, on or about May 5, 2007, Plaintiff attempted to board the *Hound Dog* at its slip in Red Hook, St. Thomas without submitting a signed Release." (Bello Decl. ¶ 9.) When Plaintiff refused to provide a release, the captain of the *Hound Dog*, Geza Sinkovics, did not permit Plaintiff to board. Plaintiff then approached Mr. Bello, who was on a nearby ship at the time, and asked if Plaintiff could board the *Hound Dog* without providing a signed Release . (Id. ¶¶ 9-10.) Mr. Bello responded that Plaintiff could not board the ship without submitting a signed Release. (Id. ¶¶ 9-10.) Mr. Bello claims that Plaintiff then removed a signed Release from his pocket and handed it to Mr. Bello. (Id. ¶¶ 9-10.)[1] In turn, Mr. Bello

---

[1] Mr. Bello assumes that this must have been the copy of the Release that Mr. Bello sent to Plaintiff in January, 2007. (Bello Decl. ¶¶ 9-10.)

agreed to allow Plaintiff to board the *Hound Dog*.[2]

Plaintiff refutes Mr. Bello's account of these events.  (Oran Aff. ¶ 3.)  Plaintiff claims that "[he] was neither prevented from boarding the *Hound Dog* and told [he] must sign a release, nor did [he] present a release to Mr. Bello which [he] produced from [his] pocket, or from anywhere else for that matter."  (Id. ¶ 3.)  The only document Plaintiff affirmatively acknowledges signing is the Course Agreement.  (Id. ¶ 5.)  Specifically, in his Affidavit, Plaintiff states: "Attached to the Bello Declaration as Exhibit 'B' is a document entitled 'Fair Wind Sailing, Inc. Course Agreement' This is the document that I recall signing in order to participate in the course.  I do not recall signing any other document to participate in the course."  (Id. ¶ 5.)  Plaintiff addresses the Release in the next paragraph of his Affidavit, "Attached to the Bello Declaration as Exhibit 'C' is what purports to be a Liability Waiver and Release ("Release") signed by me.  I do not recall:  (1) reading such a Release or (2) understanding such a [R]elease as I had not even read it."  (Id. ¶ 6.)  While Plaintiff claims he does not recall signing the Release, Plaintiff admits in a Response to an Interrogatory that the signature on the Release is his own.  (Defs.' Mot. Summ. J., Ex. 2, Interrog. # 22; Defs.' Resp. Ct. Order Oct. 14, 2009, Interrog. # 22, Ex. A.)

According to Plaintiff,  on May 5, 2007, he and his wife, Mine Oran, arrived at the harbor in Red Hook, St. Thomas to board the *Hound Dog*.  Plaintiff asked for the Captain's permission to allow his wife aboard the ship for the first night of the trip.  The Captain told Plaintiff,  "that this would be alright."  (Oran Aff. ¶ 4).  The Plaintiff and his wife subsequently boarded the

---

[2] Mr. Bello further claims that Plaintiff asked if his wife could accompany him aboard the *Hound Dog* for a day or two without taking sailing lessons.  Mr. Bello responded that Plaintiff's wife could come aboard for a small fee for the service and provided that she signed a Release as well.  Plaintiff, in response, said that he was not interested in having his wife join the trip under those terms. (Bello Decl. ¶ 11.)

*Hound Dog*, and the ship set sail.  The first night the Plaintiff and his wife were aboard the ship,

it anchored off St. Thomas.  (<u>Id.</u> ¶ 4.)  In the morning, the ship sailed back to Red Hook, where

the Plaintiff's wife disembarked.  The ship then set sail again to continue its instructional

program.  (<u>Id.</u> ¶ 4.)[3]

As the sailing program was underway, Plaintiff claims he performed "traditional seaman

duties," which consisted of "assisting in the actual sailing, navigating, operation and maintenance

of the vessel," as he was instructed to do by the *Hound Dog*'s Captain.  (<u>Id.</u>  ¶ 7.)  On May 8,

2007, Plaintiff claims that the Captain ordered Plaintiff to leave the cockpit to secure a forward

hatch.  (Sec. Am. Compl. ¶ 11; Oran Aff. ¶ 7.)  As Plaintiff returned to the cockpit, he slipped on

the ship's bench cushions and fell.  (Sec. Am. Compl. ¶ 11; Oran Aff. ¶ 7.)  Plaintiff avers in his

Second Amended Complaint that Moving Defendants were negligent in failing to properly secure

the bench cushions, have proper fastening devices on the bench cushions, or warn of the bench

cushions' condition, and that such a condition rendered the *Hound Dog* unseaworthy.  (Sec. Am.

Compl. ¶¶ 12, 21.)

## II.    PROCEDURAL HISTORY

Plaintiff initiated this action on March 9, 2008, and with leave of this Court, filed a

Second Amended Complaint on April 2, 2009.  (Compl; Sec. Am. Compl.)  Invoking the Court's

subject matter jurisdiction on both diversity (28 U.S.C. § 1332)  and admiralty grounds (28

---

[3]Mr. Bello claims that on May 5, 2007 Plaintiff joined a number of Fair Wind captains and students for dinner in Red Hook, and that the next day, May 6, 2007 is when Plaintiff set sail aboard the *Hound Dog*.  (Bello Decl. ¶ 12.)  Additionally, Mr. Bello maintains that "[i]f [Plaintiff] somehow snuck his wife aboard *Hound Dog* for a brief period . . . , he did so without [Mr. Bello's] knowledge or permission and against [Mr. Bello's] specific instructions." (Supplemental Bello Decl. ¶ 3.)

U.S.C. § 1333(1)), the Second Amended Complaint alleged negligence and unseaworthiness claims against the Moving Defendants as well as negligence and product liability claims against Robertson and Caine, Pty., Ltd., Robertson and Caine, Inc., and John D. Robertson, all of whom Plaintiff alleges were involved in the manufacture or distribution of the *Hound Dog*.  Pursuant to Federal Rule of Civil Procedure 12(b)(6), Moving Defendants responded with a Motion to Dismiss Count II (the unseaworthiness claim) of Plaintiff's Second Amended Complaint. Subsequent to the Plaintiff's Memorandum in Opposition to the Motion to Dismiss (April 16, 2008) and Moving Defendants' Reply Memorandum (April 21, 2008), the Court denied Moving Defendants' Motion to Dismiss the unseaworthiness claim on April 22, 2008.  On May 26, 2008, Moving Defendants filed their Answer to the Second Amended Complaint.  Then, on July 6, 2009, Moving Defendants filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiff, in return, filed his Opposition to the Motion on July 24, 2009. Moving Defendants followed with their Reply on August 7, 2009.  The Court now turns to these Summary Judgment Motions and their accompanying submissions.

## III.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); see also Sovereign Bank v. B.J.'s Wholesale Club, Inc., 533 F.3d 162, 171-72 (3d Cir. 2008) (discussing "well-settled" summary judgment standards).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's [claims]."  Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec., 475 U.S. at 586.  "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted."  Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999); see also Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009).

7

## IV.    DISCUSSION

In order to resolve the Motion for Summary Judgment, the Court must determine:  (1) what law to apply to evaluate the validity of the Release; (2) under that law, whether the Release is valid; and (3) if the Release is valid, what is its effect on Plaintiff's negligence and unseaworthiness claims as to both Fair Wind and BFM.

### A.     Choice of Law

Plaintiff claims jurisdiction on the basis of both diversity, 28 U.S.C. § 1332, and admiralty, 28 U.S.C. § 1333(1).  Normally, in a diversity action, this Court would apply the choice of law rules of the forum state – in this case, the Virgin Islands – to determine what substantive law governs.  Thabault v. Chait, 541 F.3d 512, 535 (3d Cir. 2008) (citing Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487 (1941)).  Where the claim sounds in admiralty law, however,  federal admiralty law must be applied.  Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 131 (3d Cir. 2002) (citing Pope & Talbot, Inc. v. Hawn, 346 U.S. 406 (1953) for the proposition that "courts apply substantive admiralty law to claims that sound in admiralty regardless of whether the complaint invokes diversity or admiralty jurisdiction."); see also E. River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."); Piche v. Stockdale Holdings, LLC, No. 2006-79, 2009 U.S. Dist. LEXIS 24237, at *7-8 (D.V.I. Mar. 24, 2009) (applying federal maritime law instead of Virgin Islands law, since the matter falls within the court's admiralty jurisdiction).  Nevertheless, it remains important to note that the "exercise of federal admiralty jurisdiction does not result in automatic displacement of state law." Jerome B.

Grubart, Inc. v. Great Lakes Dredge Dock Co., 513 U.S. 527, 545 (1995).[4]

Plaintiff's claim invokes admiralty jurisdiction if the claim satisfies "conditions both of location and of connection with maritime activity." Grubart, 513 U.S. at 533. To meet the location condition, "the incident must have 'occurred on navigable water or . . . [be an] injury suffered on land [that] was caused by a vessel on navigable water.'" Gibbs, 314 F.3d at 131 (quoting Grubart, 513 U.S. at 534). The connection condition, requires the Court to consider two factors:

> A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

Grubart, 513 U.S. at 534 (internal quotations and citations omitted); see also Gibbs, 314 F.3d at 131-2 (reiterating and applying the location and connection test); Donnelly v. Slingshot Sports LLC, 605 F. Supp. 2d 613, 618 (D. Del. 2009) (same).

---

[4] Admiralty and state law are intertwined and often applied in conjunction with one another. See Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 201 (1996) (holding that state law remedies remain applicable in maritime wrongful-death actions where no federal statute specifies the appropriate relief); Grubart, 513 U.S. at 545-46 (rejecting a "proposal to synchronize the jurisdictional enquiry with the test for determining the applicable substantive law," because doing so "would discard a fundamental feature of admiralty law, that federal admiralty courts sometimes do apply state law."). Nevertheless, as the Supreme Court remarked in Yamaha,"[t]he federal cast of admiralty law, we have observed, means that 'state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system . . . .'" 516 U.S. at 211 n.8 (quoting Romero v. Intl. Terminal Operating Co., 358 U.S. 354, 373 (1959)). It then follows that "where substantive admiralty principles are placed at risk by the potential application of state law, there is 'no leeway for variation or supplementation by state law.'" In re Amtrak "Sunset Limited" Train Crash, 121 F.3d 1421, 1426 (11th Cir. 1997) (quoting Yamaha, 516 U.S. at 210) (engaging in a comparative interests analysis to determine whether admiralty or state law should apply).

Applying this jurisdictional test to the case at hand, the Court first finds that Plaintiff's claim meets the location condition. The incident occurred aboard the *Hound Dog* while sailing in the navigable waters off the coast of St. Thomas, which is sufficient to meet this portion of the test. See Piche, 2009 U.S. Dist. LEXIS 24237, at *6-7 (concluding that the "location test is clearly satisfied" where the Plaintiff was injured aboard a power boat in the coastal waters off St. Thomas).

Similarly, both prongs of the connection condition are also satisfied. First, ocean-going sailing schools are engaged in maritime commerce as they provide recreational services on navigable waters. See Gibbs, 314 F.3d at 131-32 (concluding that ocean-going passenger vessels, such as cruise lines, are engaged in maritime commerce); see also Everett v. Carnival Cruise Lines, 912 F.2d 1355, 1358 (11th Cir. 1990) (concluding that a slip and fall aboard a cruise ship was a "maritime tort, [and thus] federal admiralty law should control."). Injuries occurring aboard those vessels engaged in maritime commerce necessarily have the potential to disrupt such commerce, and thus meet the first prong of the connection condition. See Donnelly, 605 F. Supp. 2d at 618 (determining that an injury suffered when kiteboarding on navigable waters satisfied the connection test and citing cases from multiple jurisdictions to demonstrate the test's permissive scope); Tagliere v. Harrah's Ill. Corp., 445 F.3d 1012, 1015 (7th Cir. 2006) (concluding that a plaintiff's injury after her stool collapsed aboard a moored casino boat met Grubart's "connection test" and remanding the case for a distinct admiralty jurisdiction issue); see also Calhoun v. Yamaha Motor Corp., U.S.A., 216 F.3d 338, 351 (3d. Cir. 2000) (concluding that admiralty law should be applied to determine liability where plaintiff was injured as the result of her jet ski colliding with an anchored vessel in United States territorial

waters).

And second, the general character of learning to sail, or simply sailing on navigable waters for that matter, demonstrates a substantial relationship to traditional maritime activity. See Piche, 2009 U.S. Dist. LEXIS 24237, at *7-8 (concluding that a claim for an injury suffered by a passenger aboard a motor boat engaged in a snorkeling expedition evinced a sufficient relationship to traditional maritime activity). As the Court in Grubart noted, "[n]avigation of boats within navigable waters clearly falls within the substantial relationship; [and] storing them at a marina in navigable waters is close enough." Grubart, 513 U.S. at 539-40 (citing Foremost Ins. Co. v. Richardson, 457 U.S. 668, 675 (1982) and Sisson v. Ruby, 497 U.S. 358, 367 (1990)). In the present case, the *Hound Dog* was either sailing or docked in navigable waters, and thus was engaged in sufficient maritime activity to meet this prong of the connection condition.

In sum, the alleged maritime tort in the present case satisfies "the conditions both of location and of connection with maritime activity." Grubart, 513 U.S. at 534. Thus, the case invokes admiralty jurisdiction, and requires the application of federal admiralty law. Gibbs, 314 F.3d at 132-133.

**B.    Signing the Release**

Before addressing the further implications of its admiralty jurisdiction, the Court now turns to the factual question of whether Plaintiff signed the Release relating to his participation in Fair Winds' sailing school.

Whether Plaintiff signed the Release may be a material fact, but it is not a genuine issue. Despite Plaintiff's contention that Mr. Bello's account of Plaintiff returning the signed Release is untrue and that Plaintiff claims he cannot recall signing or reading the Release, Plaintiff admitted

in response to an interrogatory that the Release in fact does bear his signature. (Oran Aff. ¶¶ 3, 5-6; Defs.' Mot. Summ. J., Ex. 2, Interrog. # 22; Defs.' Resp. Ct. Order Oct. 14, 2009, Interrog. # 22, Ex. A.) Interrogatory twenty-two and its corresponding response, attached as "Exhibit 2" to Defendants' Motion for Summary Judgment, reads as follows:

> INTERROGATORY NO. 22
> State whether your signature appears on the document a copy of which is attached hereto as Exhibit A. If you claim the signature is not yours, identify the person or persons to who the affixed signature to the document of which Exhibit A is a copy.

> RESPONSE TO INTERROGATORY NO. 22
> Yes.

(Defs.' Mot. Summ. J., Ex. 2, Interrog. # 22.) Although "Exhibit A" referenced in the interrogatory was not attached to Defendants' Summary Judgment Motion, Defendants – in response to the Court's request – filed the original set of interrogatories as it was submitted to Plaintiff, with "Exhibit A" attached. (Defs.' Resp. Ct. Order Oct. 14, 2009.) "Exhibit A," as referenced in the interrogatory and submitted to the Court, is the Release. Moreover, Plaintiff does not deny signing the Release or claim that the signature on the Release is not his own. That Plaintiff controverts Moving Defendants' version of the events related to the signing of the release is an immaterial factual issue that does not preclude summary judgment. Plaintiff's own admission that the Release bears his signature resolves the factual dispute at hand.

### C.    The Validity of the Release

The Court now turns to Plaintiff's contention that, as a matter of law, the Release is invalid. The presence of a choice of law clause in the Release – directing that Michigan law governs its terms –  requires the Court first to consider the validity of this clause before

12

determining the effect of the contract's remaining terms.  See Milanovich v. Costa Crociere, S.P.A., 954 F.2d 763, 767-68 (D.C. Cir. 1992) (examining under admiralty law the validity of a choice of law clause contained in a release, and then applying the law of the clause's selected forum to determine the effectiveness of the release).

While the choice of law clause calls for the application of Michigan law, it is admiralty law by which the validity of the clause is judged.  Milanovich v, 954 F.2d at 767-68..  In Milanovich, the D.C. Circuit synthesized two landmark Supreme Court cases on forum selection clauses in admiralty law to pronounce a standard by which to judge a choice of law clause's validity:

> Under The Bremen and Carnival Cruise, . . . courts should honor a contractual choice-of-law provision in a passenger ticket unless the party challenging the enforcement of the provision can establish that "enforcement would be unreasonable and unjust," "the clause was invalid for such reasons as fraud or overreaching," or "enforcement would contravene a strong public policy of the forum in which suit is brought."

954 F.2d 763, 768 (D.C. Cir. 1992) (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972) and citing Carnival Cruise Lines v. Shute, 499 U.S. 585 (1991))[5]; see also Neely v. Club Med Management Servs., 63 F.3d 166, 198 (3d Cir. 1995) (referencing Milanovich, Bremen, and Carnival Cruises and noting that choice of law clauses are typically upheld in admiralty law).

Here, enforcement of the forum selection clause would not be unreasonable or unjust. Michigan law on the enforceability of such releases overlaps substantially with federal maritime

---

[5]Congress overruled Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585 (1991) "in the context of passenger tickets.  But this action by Congress discounts forum-selection clauses only in the passenger context."  Yang v. M/V Minas Leo, No. 94-15168, 1996 U.S. App. LEXIS 2235, at *4 (9th Cir. Jan. 26, 1996) (referencing 46 U.S.C. App. § 183c, now 46 U.S.C. § 30509) (internal citations omitted).

law, and even Virgin Islands law for that matter.  See, e.g., Cole v. Ladbroke Racing Mich., Inc.,

614 N.W.2d 169, 176 (Mich. Ct. App. 2000) (applying Michigan law); Piche v. Stockdale

Holdings, LLC, No. 2006-79, 2009 U.S. Dist. LEXIS 24237, at *7-8 (D.V.I. Mar. 24, 2009)

(applying admiralty law); Joseph Delponte v. Coral World Virgin Islands, Inc., 48 V.I. 386, 388-

93 (D.V.I. 2006) (applying Virgin Islands law).  Thus, even if the choice of law clause were to be

found invalid, similar legal principles would apply to determine the effect of the Release.

Moreover, the record contains no evidence of –  nor has Plaintiff alleged –  fraud or overreaching

on behalf of Moving Defendants.  And lastly, enforcement of the choice of law clause does not

offend the public policy of the Virgin Islands or courts sitting in admiralty jurisdiction, as such

clauses are routinely enforced. See La Esperanza de P.R. v. Perez y Cia. de Puerto Rico, Inc., 124

F.3d 10 (1st Cir. 1997) ("While exculpatory clauses – commonly referred to as red letter clauses

– were traditionally disfavored by courts sitting in admiralty, such clauses are today routinely

enforceable." (internal citations omitted)); Delponte v. Coral World Virgin Islands, Inc., 48 V.I.

386, 388-93 (D.V.I. 2006).  Accordingly, the Court finds that the choice of law clause is valid,

and thus, Michigan law will govern the relevant terms of the Release.

### D.    The Release's Effectiveness

This conclusion then provides a partial framework for the Court's consideration of

Plaintiff's five challenges to the Release's effectiveness.  Plaintiff claims:  (1) that the Release  is

ineffective, because it does not "clearly and unequivocally indicate[] the intentions of the

parties"; (2) that Plaintiff's failure to read or understand the Release creates a genuine issue of

material fact; (3) the Release, even if it shields Fair Wind from liability, does not protect BFM;

(4) the Release is ineffective as to Plaintiff's unseaworthiness claim; and (5), the Release is

unenforceable pursuant to 46 U.S.C. § 30509, because Moving Defendants are "owner[s] . . . [or]

. . . agent[s] of a vessel transporting passengers between ports" within the meaning of the statute.

The Court will address these arguments in turn.

### 1.     The Language of the Release and its Effectiveness as to Fair Wind

Under Michigan law, "[t]he scope of a release is governed by the intent of the parties as it

is expressed in the release.  If the text in the release is unambiguous, the parties' intentions must

be ascertained from the plain, ordinary meaning of the language of the release."  Cole, 614

N.W.2d at 176.  "A contract is ambiguous only if its language is reasonably susceptible to more

than one interpretation."  Xu v. Gay, 668 N.W.2d 166, 171-72 (Mich. Ct. App. 2003) (citing

Wyrembelski v. City of St. Clair Shores, 553 N.W.2d 651 (Mich. Ct. App. 1996)).  "The fact that

the parties dispute the meaning of a release does not, in itself, establish an ambiguity."  Cole, 614

N.W.2d at 176.

In the present case, the Release is unambiguous.  It contains explicit language providing

that Plaintiff (as the undersigned) assumes all responsibility of any injury he might sustain and

that he agrees to release from liability Fair Wind Sailing and its "officers, directors, employees or

agents . . . .".  The Release provides in pertinent part:

> This agreement must be read and signed before the participant is permitted
> to take part in the Fair Wind Sailing School program.  By signing this statement,
> the participant affirms having read it.
> The undersigned participant . . . recognizes that an element of risk is
> involved in all water sports, including sailing.  Sailing is a potentially hazardous
> sport. . . . The undersigned recognizes and accepts such dangers and assumes all
> responsibility for and risk of bodily injury, death, or property damage, whether
> known or unknown, and whether caused by the negligence of Fair Wind Sailing,
> Inc., Its [sic] officers, directors, employees or agents ("Releasees") or otherwise. .
> . . [T]he undersigned participant . . . covenants and agrees to waive, release,
> discharge and covenant not to sue Releasees from all liability, damages, claims or

> demands on account of injury to the person or property of the undersigned . . . ,
> including death, whether caused by the negligence of the Releasees, or the
> undersigned, . . . or otherwise, arising out of or in any way connected with the
> operation of the Fair Wind Sailing School or any activities on or the use of any
> facilities or equipment of the Fair Wind Sailing School or Fair Wind Sailing , Inc.

(Bello Decl. Ex. C.) (emphasis added).  The Release is comprehensive in its exculpatory

language, which the Court finds to be unambiguous and takes at its plain meaning.  Moreover,

Plaintiff's alleged injury falls under the Release's broad scope.  As the Michigan Court of

Appeals recognized of a similar release before it in Cole, "[t]he release covered all risks of any

injury that the undersigned may sustain while on the premises. As this Court has held, there is no

broader classification than the word 'all.'"  614 N.W.2d at 176 (citing Skotak v. Vic Tanny Int'l,

Inc., 513 N.W.2d 428 (Mich. Ct. App. 1994) (internal quotations omitted). Thus, as was the

conclusion in Cole, this Court finds that "[t]he release clearly expressed defendant's intention to

disclaim liability for all injuries, including those attributable to its own negligence."  614 N.W.2d

at 176 (granting summary judgment in favor of defendant horse racing track owner where

plaintiff, an exercise rider, signed a release form waiving defendant's liability for any injury

plaintiff suffered on the track).[6]

---

[6]Distinct from the Release in the present case is the release at issue in Xu v. Gay.  See 668 N.W.2d 166, 172-74 (Mich. Ct. App. 2003) (comparing the language of the releases in Cole and Skotak to that of defendant's, and finding that defendant's purported release was ineffective due to failure to include "language that would clearly indicate to the reader that by accepting its terms he is giving up the right to assert a negligence claim.").  The release in Xu appeared at the top of a gym sign-in sheet, and read as follows:

> I understand that Vital Power Fitness Center reserves the right to revoke my
> membership for failure to respect the center's rules and policies. I also understand
> that Vital Power Fitness Center assumes no responsibility for any injuries and/or
> sicknesses incurred to me or any accompanying minor person as a result of
> entering the premises and/or using any of the facilities. I additionally understand

## 2.	Failure to Read or Understand the Release

Similarly unavailing are Plaintiff's arguments that whether he read or understood the Release is a genuine issue of material fact, or in the alternative, that his failure to read or understand the Release prevents him from being bound by its terms.  It is well-established under Michigan law that "[a] release is knowingly made even if it is not labeled a 'release,' or the releasor fails to read its terms, or thought the terms were different, absent fraud or intentional misrepresentation designed to induce the releasor to sign the release through a strategy of trickery."  Xu, 668 N.W.2d at 171.  As the Michigan Court of Appeals has noted:

> one who signs a contract cannot seek to invalidate it on the basis that he or she did not read it or thought that its terms were different, absent a showing of fraud or mutual mistake. As we stated in Moffit v Sederlund, 378 N.W.2d 491 (1985) "[f]ailure to read a contract document provides a ground for rescission only where the failure was not induced by carelessness alone, but instead was induced by some stratagem, trick, or artifice by the parties seeking to enforce the contract. Id."

Paterek v. 6600, Ltd., 465 N.W.2d 342, 345 (Mich. Ct. App. 1990).

Here, whether Plaintiff read or understood the Release prior to signing is not a material factual issue, since it has no bearing on the Release's enforceability and is no defense in this situation.  Additionally, there are no claims or evidence of fraud relating to Plaintiff signing the

---

that I am not entitled to [a] refund on my membership fee or daily visit. MEMBERSHIP AND DAILY FEES ARE NEITHER REFUNDABLE NOR TRANSFERABLE.

668 N.W.2d at 171. The Michigan Court of Appeals found that this language is insufficient to constitute a waiver of liability, since conspicuously absent from the release are "the words 'waiver,' 'disclaim,' or similar language" that would put the reader on notice that his assent to the agreement would result in the waiver of a negligence claim.  Unlike the release in Xu, the Release before this Court contains encompassing and unequivocal language that informs the Plaintiff that he waives any claim against Fair Wind.

Release.  Plaintiff's only alleged ground for rescission of the Release is thus foreclosed.

### 3.     The Release's Effectiveness as to BFM

The Court finds that the Release is effective as to both Fair Wind and BFM, since Fair Wind Sailing served as BFM's agent, and "the release of the agent removes the only basis [respondeat superior] for imputing liability to the principal."  Theophelis v. Lansing Gen. Hosp., 424 N.W.2d 478, 491 (Mich. 1988).

"An agent is a person having express or implied authority to represent or act on behalf of another person, who is called his principal." Goldman v. Cohen, 333 N.W.2d 228, 228-29 (Mich. Ct. App. 1983) (quoting Stephenson v. Golden, 276 N.W. 849, 857 (Mich. 1937)) (internal quotations omitted).  As the Supreme Court of Michigan provided in Saums v. Parfet:

> Agency in its broadest sense includes every relation in which one person acts for or represents another by his authority.
>      . . . .
> The characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons. To the proper performance of his functions, therefore, it is absolutely essential that there shall be third persons in contemplation between whom and the principal legal obligations are to be thus created, modified or otherwise affected by the acts of the agent.

258 N.W. 235, 237 (Mich. 1935) (internal quotations and citations omitted).  "Also fundamental to the existence of an agency relationship is the right to control the conduct of the agent," St. Clair Intermediate Sch. Dist. v. Intermediate Educ. Ass'n, 581 N.W.2d 707, 716 (Mich. 1998). Finally, in determining under Michigan law whether an agency relationship has been created, the Michigan Supreme Court considers "'the relations of the parties as they in fact exist under their agreements or acts.'"  Id. (quoting Saums, 258 N.W. at 237 (Mich. 1935)).

Evaluating the relationship between Fair Wind and BFM, as evidenced by their acts and

the "Yacht Management Agreement" controlling Fair Wind's use of BFM's ships, the Court

concludes that Fair Wind Sailing served as BFM's agent.  The "Yacht Management Agreement"

designates Fair Wind Sailing as the operator of owner BFM's Robertson and Caine Leopard

Catamaran (the *Hound Dog*) "for the purposes of sailing instruction and yacht chartering."

(Bello Decl. ¶ 4; Bello Decl. Ex. A.,"Yacht Management Agreement.")  Under the agreement,

BFM, as the owner, was required to perform major and minor repairs, fully insure the yacht,

provide and maintain the yacht in operating condition, and give two months written notification

when it desired to use the yacht or remove it from service.  (Bello Decl. ¶ 4; Bello Decl. Ex.

A.,"Yacht Management Agreement.")  Fair Wind, as the operator, was required to repair damage

resulting from student mishaps, clean the yacht after each use, obtain agreements and releases –

as approved by BFM – from charterers and students alike, market the yacht as deemed

appropriate by BFM, and provide the schedule of its use of the yacht to BFM.  (Bello Decl. ¶ 4;

Bello Decl. Ex. A.,"Yacht Management Agreement.")  Additionally, the Agreement required that

the Yacht be available for instructional purposes no less than five weeks per year and not more

than once in any eight week period.  In consideration for this arrangement, the agreement

provided that Fair Wind would pay BFM $150 per each day the yacht is used by the school and

50% of charter revenue.

   Pursuant to the Agreement, Fair Wind obtained the express authority to represent and act

on behalf of BFM.  Fair Winds, in its capacity as operator of the *Hound Dog*, was able "to bring

about, modify, affect, accept performance of, or terminate contractual obligations between [its]

principal [BFM] and third persons." Saums, 258 N.W. at 237.  In particular, Fair Winds

remained able to form contracts with sailing school students and charterers that would bind BFM

and generate profit for the yacht owner. In this sense, Fair Winds served as a business agent for the benefit of owner BFM. Moreover, BFM, as owner, retained the responsibility to repair and insure the yacht, in addition to significant discretion to control Fair Wind's use and marketing of the yacht. The responsibility and control BFM maintained under the agreement, along with Fair Winds' ability to bind BFM to contracts with third parties, gave rise to a principal-agent relationship.

Having found this agency relationship, the Court must now consider its ramifications. A principal may be vicariously liable for the actions of its agent. Vicarious liability is "indirect responsibility imposed by operation of law." Theophelis v. Lansing Gen. Hosp., 424 N.W.2d 478, 482 (Mich. 1988); see also Al-Shimmari v. Detroit Med. Ctr., 731 N.W.2d 29, 36 (Mich. 2007) (quoting Theophelis for this proposition). "'Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other.'" Al-Shimmari, 731 N.W.2d at 36 (citation omitted). In the context of agency, "the principal 'is only liable because the law creates a practical identity with his [agents], so that he is held to have done what they have done.'" Cox v. Bd. of Hosp. Managers, 651 N.W.2d 356, 361 (Mich. 2002) (quoting Smith v. Webster, 23 Mich. 298, 299 (Mich. 1871)). It is widely-accepted, however, that the "valid release of an agent for tortious conduct operates to bar recovery against the principal on a theory of vicarious liability, even though the release specifically reserves claims against the principal." Theophelis, 424 N.W.2d at 491 (citing cases to demonstrate that "Michigan courts have adhered to this common-law rule"); In re Global Crossing, Ltd. Sec. Litig., 471 F. Supp. 2d 338, 344 (S.D.N.Y. 2006) (citing Theophelis, RESTATEMENT (THIRD) OF TORTS:

APPORTIONMENT OF LIABILITY §§ 7 cmt. J, 16 cmt. D & Reporter's Note cmt. D (2000), as well as other state common law cases for the same proposition, and releasing employers from respondeat superior liability as a result of the settlement release of employers' agents in a federal securities action).

In the case at bar, if Plaintiff established Fair Wind's negligence, BFM – as Fair Wind's principal – could be held vicariously liable. But since the Court found the Release to be valid, the Release waives any liability Fair Wind may have had for plaintiff's injuries. In turn, the common law principle addressed in <u>Theophelis</u> applies to bar recovery against BFM (the principal) for any tortious conduct by its agent, Fair Wind. <u>Theophelis</u>, 424 N.W.2d at 491. (concluding that the release of employee-agents "had the legal effect of discharging the [employer-principal] from vicarious liability . . . ."); <u>see also</u> <u>In re Global Crossing, Ltd. Sec. Litig.</u>, 471 F. Supp. 2d 338, 344 (S.D.N.Y. 2006) (applying the same state common law theory in a federal common law context). Thus, the Court grants summary judgment in favor of Moving Defendants on Plaintiff's negligence claims.

### 4.    The Release's Effectiveness as to the Unseaworthiness Claim

The Court now turns to Plaintiff's claim in admiralty of unseaworthiness. Under general maritime law,[7] Plaintiff asserts that as a sailing school student he served as a seaman aboard the *Hound Dog*, and therefore, the Moving Defendants owed him a duty to "ensure that the vessel is reasonably fit to be at sea." <u>Lewis v. Lewis & Clark Marine, Inc.</u>, 531 U.S. 438, 441 (2001) (citing <u>Mitchell v. Trawler Racer, Inc.</u>, 362 U.S. 539, 550 (1960)); <u>see also</u> <u>Fasold v. Del. River</u>

---

[7] Plaintiff explicitly states that his complaint does not invoke the Jones Act. (Pl.'s Opp'n to Defs.' Mot. Summ. J. at 7.) The Court, thus, will not consider the Jones Act's applicability.

& Bay Auth., No. 03-3624, 2004 U.S. App. LEXIS 26709, at \*4-5 (3d Cir. 2004) (addressing the elements of an unseaworthiness claim). Moving Defendants maintain that the Release Plaintiff signed is effective as to his unseaworthiness claim despite its maritime nature, and thus, the Release works to bar Plaintiff's suit. Having previously found that Plaintiff signed the Release and that the Release waived Plaintiff's negligence claim, the Court similarly finds that the Release precludes the Plaintiff's unseaworthiness action.

"Releases signed by seamen, the 'wards of the admiralty,' are given the most careful scrutiny by admiralty courts." Aguiluz-Nunez v. Carnival Cruise Lines, Inc., 584 F.2d 76, 78 (5th Cir. 1978) (quoting Garrett v. Moore-McCormack Co., 317 U.S. 239, 246 (1942)). "'[S]uch releases are not wholly invalid, but are jealously scrutinized to see that these 'wards of the admiralty' have not been overreached.'" Law v. United Fruit Co., 264 F.2d 498, 499 (2d Cir. 1959) (quoting Bonici v. Standard Oil Co., 103 F.2d 437, 438 (2d Cir. 1939). "[N]evertheless, a release fairly entered into and fairly safeguarding the rights of seaman should be sustained. . . . Fair settlements are in the interest of the men, as well as of the employers." Bonici,103 F.2d at 439. In Garrett, the Supreme Court, addressing the effectiveness of a release as to statutory and common law maritime claims, provided the standard by which courts are to evaluate such releases: "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration [is] . . . relevant to an appraisal of this understanding." 317 U.S. at 248.

This Court thus analyzes the effectiveness of the Release once again, but this time, under the heightened scrutiny applied to such documents in the admiralty context and with the burden

on Moving Defendants to demonstrate that Plaintiff freely and fairly executed the Release. The

record, as the Moving Defendants set forth, reveals that Plaintiff is well-educated, having

obtained both a Masters and Bachelor of Arts in Political Science. (Defs.' Mot. Summ. J., Ex. 2,

Interrog. # 3.) Plaintiff also has over twenty-two years of professional experience as an

immigration inspector for the United States Customs and Border Protection Agency. (Defs.'

Mot. Summ. J., Ex. 2, Interrog. # 4.) Plaintiff's education and experience renders him

sufficiently capable of comprehending the consequences of signing the Release from a reading of

the document. Compare In re Complaint of Ruley,1989 A.M.C. 344 (N.D. Ill. 1988) (concluding

that a signed release relating to participation as a crew member in a sailboat race barred

unseaworthiness claim where: (1) an educated Plaintiff experienced no fraud or coercion in

signing the release; and (2) the release was "a consensual agreement between two intelligent

adults who were under no compulsion to agree."), with Aguiluz-Nunez, 584 F.2d at 78 (finding a

genuine issue of material fact as to whether the plaintiff seaman, possessing a fifth-grade

education, understood the significance of signing a release of liability where plaintiff claimed

that "the significance of the release was not explained to him, his legal rights were not discussed,

that he understood he was receiving the $1,500 not to settle liability, but to cover medical

expenses, and that he was rushed into signing the release.").

Additionally, as noted above, Plaintiff admits to signing the Release. Although Plaintiff

claims he cannot recall reading the Release, Plaintiff notably does not challenge Moving

Defendants' assertion that he had sufficient ability and opportunity to understand the Release.

Plaintiff, moreover, has made no claims of overreaching, deception, or fraud on behalf of

Moving Defendants. Finally, sufficient consideration supports the validity and effectiveness of

the Release. Plaintiff and Moving Defendants engaged in a consensual arrangement whereby

Plaintiff would receive sailing instruction in exchange for his payment and waiver of certain

rights as specified in the Release. Even under the scrutiny applied to such releases, the Court

concludes that Plaintiff's execution of the Release willingly forfeited any potential

unseaworthiness claim as to Moving Defendants.[8]

### 5. 46 U.S.C. § 30509's Applicability

Plaintiff's final attack on the validity of the Release is his argument that Plaintiff and his

wife were passengers aboard the *Hound Dog* and were being transported between ports within

the meaning of 46 U.S.C. § 30509.

46 U.S.C. § 30509 provides in pertinent part:

> Provisions limiting liability for personal injury or death
> (a) Prohibition.
>   (1) In general. The owner, master, manager, or agent of a vessel transporting
> passengers between ports in the United States, or between a port in the United
> States and a port in a foreign country, may not include in a regulation or contract a
> provision limiting –
>     (A) the liability of the owner, master, or agent for personal injury or death
> caused by the negligence or fault of the owner or the owner's employees or
> agents; or
>     (B) the right of a claimant for personal injury or death to a trial by court of
> competent jurisdiction.
>   (2) Voidness. A provision described in paragraph (1) is void.

46 U.S.C. § 30509 (2009) (formerly 46 U.S.C. app. § 183c). Section 30509 has been held to

invalidate any release or contract purporting to limit a cruise ship's liability for its passengers.

See Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1334-35 (11th Cir. 1984)

---

[8] While there is considerable doubt as to whether Plaintiff qualifies as a seaman under
admiralty law and thus, even could have asserted such a maritime claim in the first place, the
Court need not address this issue in light of this conclusion.

(concluding that 46 U.S.C. app. § 183c invalidated Carnival's disclaimer of liability for negligence in the contract of passage presented to each passenger).

Section 30509, however, is inapplicable to Plaintiff's claim  The *Hound Dog* is not a vessel transporting passengers between ports in the United States within the meaning of the statute, but rather it is a recreational vessel used for sailing instruction purposes.  See Shultz v. Florida Keys Dive Ctr., Inc., 224 F.3d 1269, 1271 (11th Cir. 2000) (concluding that § 183c does not invalidate a scuba diving release pertaining to a recreational maritime excursion).   Plaintiff, as a participant in a recreational sailing class, is distinct from those class of people who may be characterized as passengers aboard, for instance, a cruise ship or other common carrier. Plaintiff's purpose in being aboard the *Hound Dog* was to learn to sail, not to obtain transport from one location to another.  Thus, 46 U.S.C. § 30509 does not invalidate the Release.

## V.    CONCLUSION

In sum, viewing the evidence in the light most favorable to Plaintiff and resolving all factual discrepancies in Plaintiff's favor, the Court finds no genuine issue of material fact allowing Plaintiff to sustain his negligence and unseaworthiness claims against Moving Defendants.  Moving Defendants' Motion for Summary Judgment is, therefore, granted.

An appropriate order follows.